# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| OTIS ELEVATOR COMPANY, | ) |
| Plaintiff, | ) |
| vs. | )    CV 12-J-1708-NE |
| W.G. YATES & SONS CONSTRUCTION COMPANY, a/k/a Yates Construction, | ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Otis Elevator Company ("Otis") filed this action for breach of contract alleging that W. G. Yates & Sons Construction Company ("Yates") has failed to pay Otis the money owed Otis under the subcontract with Yates of December 7, 2010 (docs. 1, 7, 8 and 25). The court previously determined that if Otis complied with the contract, Yates' breach is remediable under the Alabama Prompt Pay Act, Ala. Code § 8-29-1, *et seq.*, which provides for interest at 12% per annum plus attorney's fee. *See* Memorandum Opinion, April 3, 2013 (doc. 57).

Yates filed a counterclaim alleging that Otis breached the subcontract at issue by failing to install escalators with a step width of 40 inches and by failing to call to the attention of Yates that Otis was deviating from the Contract Documents by furnishing and installing escalators with a step width of 32 inches, resulting in damages to Yates for the costs to remedy said alleged breach (doc. 11).

The court conducted a bench trial on June 10-13, 2013, at which both parties were present and represented by their respective counsel.

## FACTUAL BACKGROUND

The subcontract in question arose out of the baggage claim expansion project for Huntsville Madison County Airport Authority (the "Owner").  The architect for the project was Chapman Sisson Architects (the "Architect"). *See* Subcontract, p. 1, (submitted as Def.'s Exh. 9); OTIS Stipulated Facts #2.[1] Yates was the general contractor for the project. *See* OTIS Stipulated Facts #2. As part of the work, Yates was required to install four escalators, two interior and two exterior. *See* Trimmer Decl., ¶ 3 (submitted as Def.'s Exh. 41); OTIS Stipulated Facts #3. Yates solicited and received bids from three escalator suppliers, plaintiff Otis, and non-parties Thyssen Krupp and Schindler, for the supply and installation of the escalators. OTIS Stipulated Facts #6. All three were asked to bid according to the plans and specifications. *Id.* The plans and specifications were made available at a website for viewing or downloading. Decl. of Trey Steber, ¶ 2 (submitted as Def.'s Exh. 33).

Escalators generally have two dimensions for width, rated width ("nominal width") and step width (or "tread width"), being the width of the escalator stair treads. Rated width is approximately 8 inches wider than step width. Standard step widths are typically 24 inches, 32 inches, and 40 inches, and the corresponding rated widths are approximately 32 inches, 40 inches, and 48 inches, respectively.[2] *See* Steber

---

[1]Proposed stipulations of facts were submitted as plaintiff ex. 73.

[2]Evidence at trial did support a finding that these measurements are approximate and vary between manufacturers by a half inch or so.

Decl., ¶ 3. Nowhere in the project specifications is either a rated width or a step width specified. *Id.*; OTIS Stipulated Facts #4 & 5. One of the contract drawings, Drawing A180, did depict certain escalator drawings. *See* Yates Stipulated Facts #3. Detail C6 of Drawing A180 addressed the two interior escalators and Detail A1 of A180 addressed the two exterior escalators. Steber Decl., ¶ 4; Yates Stipulated Facts #5. Based on these plans and specifications, Otis and non-party Thyssen Krupp both proposed to supply and install escalators with a 32 inch step width. *See* Trimmer Decl., ¶10; OTIS Stipulated Facts #6 & 7. The only bidder who proposed installing escalators on the project with a step width of 40 inches was non-party Schindler, whose product was the undisclosed basis for the design.[3] OTIS Stipulated Facts #8; Pl.'s Exh. 75 p. 13 (Pinkston depo).[4] Yates chose Otis as the lowest bidder, but did not issue the subcontract in question until the Architect had approved Otis' shop drawings and product literature. Those drawings and product specification literature clearly show that Otis' proposal was for 32 inch step width escalators. OTIS Stipulated Facts # 7, 10, & 11; Pl.'s Exh. 75, p. 10-12 (Pinkston Depo); Shop Drawings (submitted as Def.'s Exh. 4 & 5). Yates also reviewed and approved Otis' submissions and shop drawings. OTIS Stipulated Facts # 7, 10, & 11; Pl.'s Exh. 75, p. 10-12 (Pinkston's depo); Shop Drawings (submitted as Def. Exh 4 & 5). At no

---

[3]The testimony at trial revealed that architects will often select a particular manufacturer of a product and base drawings off that manufacturer's product specifications.

[4]When referring to plaintiff's ex. 75, Pinkston's deposition, the court is referring to the pages on the bottom of the exhibit, and not to the page numbers of the excerpts of the deposition itself.

time during the submittal and review process did either the Architect or Yates object to the specified step width of 32 inches, nor did either of them ever express that escalators built to such specifications would not comply with the project plans and specifications. Pl. Exh. 75 p. 11-12 (Pinkston depo.).

After Yates and the Architect approved Otis' shop drawings, the issuance of a signed subcontract ensued and Otis ordered and had delivered the 32 inch step width escalators. Trimmer Decl., ¶ 12. Yates constructed the wellways, or directed the construction by another subcontractor, that is the pits where the escalator motor and equipment are installed, for the escalators. OTIS Stipulated Facts #13. Yates constructed the wellways to accommodate 32 inch step width escalators. Trimmer Decl., ¶ 12. At no time during this process did Yates or the Architect raise any issue concerning the 32 inch step width escalators. Pl. Exh. 75, p. 11-12 (Pinkston depo.); Trimmer Decl., ¶ 12; OTIS Stipulated Facts # 18.

As the escalator work was nearly finished in March of 2012, the Owner objected to the 32 inch step width. OTIS Stipulated Facts # 18; Pl. Exh. 75 p. 16 (Pinkston depo.); Letter from the Owner of March 19, 2012, (submitted as Pl.'s Exh. 5). A meeting was held regarding this issue on March 26, 2012, with the Owner, the Architect, Yates and Otis representatives all in attendance. OTIS Stipulated Facts # 19. Following that meeting, on March 28, 2012, Yates drafted a letter to the Owner. Pl's Exh. 12 & 13. In that letter Yates stated, among other things,

> CSA [the Architect] had the opportunity to reject the escalators during
> the submittal review process. Though not clearly identified in the
> Contract Documents, the OTIS shop drawings identify clear tread width
> and critical dimensions. [The Architect] reviewed the submittal and
> indicated that the shop drawings complied with the design intent. Based
> upon the information provided in the Contract Documents and
> compliance of shop drawings with the intent design the **escalators
> comply with the Contract Requirements.**

Pl's Exh. 13 (emphasis added). In that same letter, Yates pointed out that two of the

three bidders read the contract documents to require escalators with 32 inch step

width. *Id.*[5]

Subsequent to this letter, the Owner, disagreeing with Yates' position as stated

in that letter, started threatening Yates with liquidated damages of $5,000 per day and

tacitly threatened to never do business with Yates again. Yates Stipulated Facts # 19.

At this point Yates changed its opinion as to whether or not the installed escalators

were in conformance with the Contract Documents, concluding for the first time that

they were not.  In the end, the dispute between Yates and the Owner resulted in a

Change Order (#75). *See* Letter from Yates to Otis dated May 7, 2012, (submitted as

Def.'s Exh. 27). In agreeing to perform the work under Change Order 75, Yates did

not reserve its rights against the owner.  Otis, however, agreed to do the work under

---

[5] The letter was approved not only by Pinkston but also by Jeff Cross, Yates' Senior Vice President. Yates later took the position that they were acting as advocates for Otis. Pl. Exh. 75, p. 28-31(Pinkston depo.). However, the fact remains that the letter was from Yates (not Otis) to the Owner. *Id.* Mr. Pinkston took the position at trial, contrary to his deposition testimony, that the letter from Yates to the Owner of March 28, 2012, was only a draft and was not transmitted outside of Yates. Instead, the draft was revamped into what became the letter of March 29, 2012. *See* Def.'s Exh. 18. This letter appears to be a proposal for a resolution of the dispute between Yates and the Owner as it states: "The proposed amounts are not an admission of guilt or liability by Yates or OTIS and are only an effort to bring timely resolution to support the Project schedule." *Id.*

Change Order 75, but did so under reservation of rights. Yates has not paid Otis for any work done by Otis on the project since January 2012, even though Yates has been fully compensated for the work it performed, as well as what Otis performed, on the project. OTIS Stipulated Facts # 23 & 25.

Nowhere do the Contract Documents made available to Otis and the other bidders actually state the step width as 40 inches. Yates Stipulated Facts # 8; *see also* Drawing A180, Detail A1 and Detail C6.

## I. The Contract is Ambiguous

At the center of this dispute is a question of contract interpretation. Under general Alabama rules of contract interpretation, the intent of the contracting parties is discerned from the whole of the contract. *See Loerch v. National Bank of Commerce of Birmingham*, 624 So. 2d 552, 553 (Ala. 1993). Where there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning. *See Ex parte Dan Tucker Auto Sales, Inc.*, 718 So. 2d 33, 36 (Ala. 1998). If the court determines that the terms are unambiguous, then the court will presume that the parties intended what they stated and will enforce the contract as written. *See id.* at 36; *Voyager Life Ins. Co. v. Whitson*, 703 So. 2d 944, 948 (Ala. 1997). If the court determines that the terms are ambiguous, then the court must use established rules of contract construction to resolve the ambiguity. *See Whitson*, 703 So. 2d at 948. Under those established rules,

where there is a choice between a valid construction and an invalid construction the court has a duty to accept the construction that will uphold, rather than destroy, the contract and that will give effect and meaning to all of its terms. *See id.* at 948-49; *Sullivan, Long & Hagerty v. Southern Elec. Generating Co.*, 667 So. 2d 722, 725 (Ala. 1995). Additionally, "if there exists inconsistency between two clauses of a contract which cannot be reconciled, the inconsistency must be resolved in favor of the prior clause, unless an intention to thereafter qualify is plainly expressed." *City of Fairhope v. Town of Daphne*, 208 So. 2d 917, 924 (1968); *see Whitson*, 703 So. 2d at 949. Lastly, if all other rules of contract construction fail to resolve the ambiguity, then, under the rule of *contra proferentem*, any ambiguity must be construed against the drafter of the contract. *See Lackey v. Central Bank of the South*, 710 So. 2d 419, 422 (Ala. 1998).

The court must first determine whether the contract unambiguously calls for a 40 inch step width escalator. The parties stipulated that "[t]he Project specifications set forth certain performance requirements but had no dimensions for the escalators to be installed." OTIS Stipulated Facts # 4. It was further stipulated that "[t]he project drawings showed some dimensions of the escalators, but did not use the phrase "step width" or "tread width" on any of the drawings." *Id.* # 5. Additionally, neither the width of 32 inches nor of 40 inches appear anywhere on Drawing A180. Yates' additional stipulation #8. These stipulations are an admission that the contract

documents do not specify the step width of the escalators in question.

At trial, Yates argued that a 32 inch step width cannot be supported by the tick marks and dots on drawing A180, the dimension shown of 3'-3½" inches, and the scale provided on the drawings. Although Yates attempted to demonstrate the scale to the court, none of the dimensions shown to scale exactly equated to a 32 inch step width or a 40 inch step width escalator's finished dimensions. A 32 inch step width escalator is approximately 40 inches installed and a 40 inch escalator is approximately 48 inches installed. The 3'-3½" inch dimension could therefore equate to an installed 32 inch step width escalator or the step width of a 40 inch step width escalator. Because the specifications, drawings, and/or dimensions do not clearly indicate the step width of the escalator, the contract is ambiguous as to the step width.

## II. Architect's Decision is Reviewable

Yates argues that even if the contract is ambiguous, Subcontract ¶ 1.1 of the contract invests the Architect with binding decision-making authority. The pertinent part of paragraph 1.1 states: "If there is any conflict, ambiguity, or inconsistency within or between any such [contract documents] or a difference in interpretation, the matter shall be referred to the *appropriate design professional* whose decision the Subcontractor shall implement at no additional cost." (emphasis added). Yates claims that this binds Otis to the Architect's decision that the plans called for a 40" step

width escalator.[6]  This contract clause, however, is ambiguous at best. "Appropriate

design professional" is not defined by the contract. This language could as easily refer

to a neutral arbitrator or an escalator consultant as to Chapman Sisson Architects.

Even if the court were to consider Chapman Sisson the "appropriate design

professional," Chapman's decision is reviewable in this case. "Alabama caselaw has

upheld the right of contracting parties to agree that the decision of an expert such as

an architect or engineer is final." *Finish Line v. J.F. Pate & Associates Contractors,*

*Inc.*, 90 So. 3d 749, 758 (Ala. Civ. App. 2012). That decision is reviewable, however,

when there is evidence of "fraud, or such gross mistakes as would imply bad faith or

a failure to exercise an honest judgment." *Id.* at 759 (quoting *Shriner v. Craft*, 166

Ala. 146, 158 (1910).

Trial testimony established that Chapman had an intern draft the escalator

drawings. Christopher Waters, the Chapman Sisson architect who reviewed the

intern's drafts, testified that the firm knew of the importance to the Owner for all new

equipment to match existing equipment.  However, Chapman failed to make any such

statement on the drawings or specifications with respect to the width of the escalators.

Chapman reviewed two sets of shop drawings by Otis that both specified a 32 inch

step width. Although the first shop drawing was rejected, Chapman made no mention

---

[6] Yates initially argued that the contract is unambiguous. Here, Yates takes the contrary
position, arguing that the contract is ambiguous and that the ambiguity invokes Subcontract ¶ 1.1.
While Yates claims this provision applies, the provision itself only applies if there is any
"conflict" or "ambiguity."  At the same time, Yates argues there is not ambiguity in the contract
documents.  These arguments by Yates are mutually exclusive.

of the step width as a reason for rejection. The second shop drawing clearly indicated a 32 inch step width and was approved by Chapman. The second shop drawing was stamped by Christopher Waters, AIA, on December 3, 2010, as "Concept conforms with Design Concept." Def.'s Exh. 4. The subcontract was executed on December 7, 2010, and Otis delivered escalators and began to install them on the project. OTIS Stipulated Facts # 12 & 13. In March 2012, the escalator work was nearing substantial completion. *Id.* at # 17. Not until approximately March 15, 2012, did any question or issue arise concerning the step width. *Id.* at # 18. During the 16 month period between approval of Otis' shop drawings by the Architect and the first question concerning step width, the Owner had inspectors on site on a daily basis, Yates had superintendents on site on a daily basis, and the Architect made site visits and periodic inspections of the project. *Id.* at # 14, 15, & 16.

   As stated in *Blount Bros. Const. Co. v. United States*, 346 F.2d 962, 968, 971-973 (Fed.Cir. 1965), "Silent specifications coupled with imperfect drawings create an ideal climate for confusion. A few simple words in the specifications, or the correction [of the drawing] would have been a beacon to the plaintiff as to what was wanted . . . and would have avoided this lawsuit." Here, the specifications were silent and the drawings imperfect. Nowhere on the drawings was a 40" step width dimension depicted, and none of the dimensions on the drawings were labeled as to what they designated.  A few simple words would have clarified what was desired.

All the Architect had to do was exactly what he did in Change Order 75 - specify the step width in the specifications and/or label the step width on the drawings. Unfortunately, the Architect did neither in the original contract documents.

The Architect naturally denied at trial, in hindsight, that his own plans, created by an intern, were faulty. The evidence showed that the escalator plans were latently ambiguous because multiple contractors bid a 32 inch step width and no bidding contractor questioned the step width.  Knowledge of Otis' intent to supply escalators with a 32 inch step width is imputed to the Architect by its approval of Otis' specifications and by allowing Otis to substantially complete installation of the escalators before alleging that the same failed to comply with the contract documents. The Architect's rejection of the 32 inch step width constituted an arbitrary action and a failure to exercise honest judgment. The court, therefore, finds that the Architect's decision is not binding on the parties in this case.

### III. Otis Did Not Breach the Contract

In *Blount*, the contractor was awarded an equitable adjustment to his contract because he had adopted a reasonable interpretation of the plans and specifications, had performed based upon that interpretation, and then was required to perform in a different manner. *Blount*, 346 F.2d at 963. In this case, Otis' interpretation of the plans and specifications is likewise reasonable. Two of the three escalator bidders - the only two whose product was not the basis of design- proposed 32" step width

escalators. Yates did not object to the 32" in Otis' proposal and approved the Otis shop drawings showing 32" steps. Likewise, the Architect looked at the shop drawings (which unambiguously showed 32" step width escalators) and approved the submittals with no objection to the 32" steps.

Otis was consistent throughout, from its proposal to its shop drawings to what it proposed to install, and did in fact install, on the job. If the imperfect drawings had presented an "open and obvious" or "patent" ambiguity, at least one of the general contractor bidders or one or more of their escalator subcontractors would have sought clarification pre-bid.[7]  However, the Architect testified, and no one disputed, that there were no pre-bid questions about the escalators' dimensions.  Where a bidder reasonably interprets unclear plans and specifications, the bidder is protected if he later required to perform in a different manner. *United States v. Spearin,* 248 U.S. 132 (1918) (when a contractor follows plans and specifications according to his reasonable interpretation of those contract documents, the contractor is entitled to additional compensation if he is later required to perform in a different and more expensive way); *Blount Bros. Const. Co. v. United States,* 346 F.2d 962 (Fed. Cir. 1965) (same); *Mountain Home Contractors v. United States,* 425 F.2d 1260, 1263-64

---

[7]In fact, the court heard testimony from the Otis representative that Otis bid the project with 32" step width escalators because that was the only product it had which would fit in the openings depicted in the drawings.

(Fed. Cir. 1970) (where discrepancy is not glaring and obvious, a contractor is protected where he is reasonably misled by inadequate contract documents).  Under these circumstances, the contractor is not under a duty to seek clarification.  *Id*., at 1264.

The plans and specifications failed to clearly and unambiguously call for 40" step width escalators. Thyssen Krupp and Otis, the only two escalator bidders who submitted proposals strictly off the plans and specifications as written, both proposed 32" step width escalators. The specifications were silent as to step width. The drawings did not label any of the escalator dimensions they contained. Otis is therefore entitled to compensation for the installation of the 32 inch step width escalators because Otis is not in breach of contract.

### IV. Otis is Entitled to Compensation for the Change Order 75 Work

Otis is entitled to compensation for the Change Order 75 work because these additional costs to Otis resulted from silent specifications coupled with imperfect drawings. In *Blount*, the contractor was awarded an equitable adjustment to his contract because he had adopted a reasonable interpretation of the plans and specifications, had performed based upon that interpretation, but then was required to perform in a different manner. *Blount*, *supra*. "Where the parties to a special contract deviate from the original plan agreed upon and the terms of the original

contract do not appear to be applicable to the new work, it being beyond what was originally contemplated by the parties, it is undoubtedly to be regarded and treated as a work wholly extra, outside the scope of the contract, and may be recovered for as such. A contractor may recover the reasonable value of additional work necessitated by a material change of specifications." *Allied Mills, Inc. v. St. John*, 152 So. 2d 133, 136 (1963) (quoting 12 Am.Jur., Contracts, § 325).

As found by the court, Otis' interpretation of the plans and specifications was reasonable. Two of the three escalator bidders - and the only two who were not the basis of the design- proposed 32" step width escalators. Yates did not object to the 32" step width in Otis' proposal and approved the Otis shop drawings showing 32" steps. Likewise, the Architect looked at the shop drawings (which unambiguously showed 32" step width) and approved the submittals with no objection to the 32" steps.

Change Order 75 required Otis to relocate the already in place interior escalators and provide an additional 40" step width escalator.  Otis' interpretation of the original contract was reasonable and acceptable to Yates, the Architect, and the Owner until an objection was raised after substantial performance.  Change Order 75,

therefore, constitutes "extra work"[8] beyond the scope of the original contract and Otis is due compensation as outlined by Change Order 75.

## V. The Indemnity Provision is not Applicable to This Dispute

Yates asserts in its counterclaim that the subcontract imposed upon Otis comprehensive duties to indemnify Yates from any loss, cost, or damages in any way related to Otis' work and regardless of Yates' alleged negligence. *See* Yates' Ex. 9, Art. XI. Article XI of the subcontract states:

> TO THE FULLEST EXTENT PERMITTED BY LAW, THE SUBCONTRACTOR COVENANTS TO DEFEND, INDEMNIFY, HOLD HARMLESS, PROTECT, AND EXONERATE BOTH THE CONTRACTOR AND ITS AFFILIATES, AGENTS, EMPLOYEES, REPRESENTATIVE, AND SURETIES AND THE OWNER ARCHITECT, AND ENGINEERS, JOINTLY AND SEVERALLY, FROM AND AGAINST ANY AND ALL LIABILITY, CLAIMS, DAMAGES, LOSSES, SUITS, ACTIONS, DEMANDS, LIENS, ARBITRATIONS, ADMINISTRATIVE PROCEEDINGS, AWARDS, JUDGMENTS, EXPENSES, COSTS, AND ATTORNEY'S FEES PERTAINING TO ECONOMIC LOSS OR DAMAGE, LABOR DISPUTES, SAFETY REQUIREMENTS, PERFORMANCE OR NON-PERFORMANCE OF OBLIGATIONS, CERTIFICATIONS, PROPERTY RIGHTS OF THIRD PARTIES, PERSONAL INJURY, BODILY INJURY, SICKNESS, DISEASE, DEATH, OR DAMAGE TO OR DESTRUCTION OF PROPERTY (INCLUDING LOSS OF BODILY INJURY, SICKNESS, DISEASE, DEATH, OR DAMAGE TO OR DESTRUCTION OF PROPERTY (INCLUDING LOSS OF USE THEREOF) WHICH (I) ARE CAUSED IN WHOLE OR IN PART BY

---

[8] Extra work," as used in connection with a building and construction contract, means work of a character not contemplated by the parties and not controlled by the contract. *Blair v. United States*, 66 F. Supp. 405, 408-09 (M.D. Ala. 1946) aff'd, 164 F.2d 115 (5th Cir. 1947) (citing 17 C.J.S., Contracts, § 371, page 851, n. 85).

THE SUBCONTRACTOR . . . , (II) ARISE FROM OR OCCUR IN CONNECTION WITH WORK UNDERTAKEN OR TO BE PERFORMED BY THE SUBCONTRACTOR, REGARDLESS OF WHETHER THE SAME IS WITHIN OR BEYOND THE SCOPE OF WORK, OR (III) ARISE FROM OR ARE CONNECTED WITH ANY OTHER ACT OR OMISSION RELATING TO THE SUBCONTRACTOR, THIS SUBCONTRACT, OR THE SUBCONTRACT WORK. IT IS THE SPECIFIC AND EXPRESS INTENT OF THIS SUBCONTRACT FOR THE FOREGOING COVENANTS AND INDEMITY OBLIGATIONS TO APPLY TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, REGARDLESS OF WHETHER THE LIABILITY IS CAUSED IN PART BY A PARTY INDEMNIFIED HEREUNDER INCLUDING, WITHOUT LIMITATION, WHETHER OR NOT THE SAME BE CAUSE BY, OR ARISE OUT OF, THE JOINT, CONCURRENT, OR CONTRIBUTORY NEGLIGENCE OF A PARTY INDEMNIFIED HEREUNDER.

*Id.* (emphasis in original). Yates claims that Otis refused to indemnify Yates from all liability as required by this clause.  Yates asserts that Otis cannot now contest responsibility to Yates for the additional costs Yates incurred due to Change Order 75, and further asserts that Otis must indemnify Yates for these costs and expenses.

The court need not decide if the above provision requires Otis to indemnify Yates because another clause in the contract conflicts with the above indemnity provision and changes the provision. Under Alabama Law "if there exists inconsistency between two clauses of a contract which cannot be reconciled, the inconsistency must be resolved in favor of the prior clause, unless an intention to thereafter qualify is plainly expressed." *City of Fairhope v. Town of Daphne*, 208

16

So.2d 917, 924 (1968).   Exhibit "C" to the contract is a contract rider. *See*

Subcontract, Def. Exh. 9 at D009-054 - 055. At trial, testimony by James Pinkston

and Dave Trimmer established that the rider is a standard addition to all contracts

between Yates and Otis. It was also established that the rider was intended to change

Yates' standard contract.[9] Paragraph 8 of the rider impacts Article XI of the

subcontract as follows:

> Article XI - Otis agrees to indemnify Yates for losses due to personal
> injury or property damage to the extent caused by the <u>negligent</u> acts or
> omissions of Otis, its employees, agents, and subcontractors during the
> performance of the work, but not to the extent caused by others.
>
> Any claim involving negligence of more than one party shall be handled
> so each party is responsible and liable for its share of the damages in
> proportion to its share of negligence. In the event of a lawsuit, Otis
> agrees to reimburse Yates for its defense cost to the extent of Otis'
> responsibility.

Subcontract at bates D009-055 (emphasis in original). This language limits Otis'

indemnity obligation to damages caused by Otis' own negligence. The court has

found that Otis was not in breach of its contract with Yates and therefore was not

negligent in its performance. Thus Otis is not contractually required to indemnify

Yates.

---

[9] This is also established by the parties conduct. Paragraph 11 of the rider changes the forum selection clause of Yates standard Article XIV from Mississippi to Alabama. *See* Subcontract pg 16 & bates D009-055. If the rider was not controlling, the parties would not have submitted to jurisdiction in the Northern District of Alabama.

## CONCLUSION

Based on the court's consideration of the foregoing, the court shall enter judgment in favor of plaintiff Otis Elevator Company on its breach of contract claim, and against defendant W.G. Yates & Sons Construction Company on its counterclaim.  The court shall Order that plaintiff Otis is entitled to recover from Yates the sum of $260,013.70, which is the unpaid subcontract balance, plus the sum of 12% per annum statutory interest from January 2012,  and further entitled to recover the sum of $123,659.97 for the cost of performance of Change Order 75, from defendant Yates.  The court shall further Order that plaintiff Otis is entitled to reasonable attorney's fees, with leave to prove the same.

**DONE** and **ORDERED** this 7th day of August, 2013.

INGE PRYTZ JOHNSON
SENIOR U.S. DISTRICT JUDGE