**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | |
|---|---|
| **OTIS ELEVATOR COMPANY,**   ] | |
| ] | |
| **Plaintiff,**   ] | |
| ] | |
| **v.**   ] | |
| ] | **Case No.: 5:12-cv-1708-KOB** |
| **W.G. YATES & SONS**   ] | |
| **CONSTRUCTION COMPANY,**   ] | |
| ] | |
| **Defendant.**   ] | |
| ] | |

**MEMORANDUM OPINION**

### I.     Introduction

This matter is before the court on Defendant W.G. Yates & Sons Construction

Company's "Motion for Summary Judgment on Remand."  (Doc. 95).

This case began when Plaintiff Otis Elevator Company ("Otis") sued Defendant W.G.

Yates & Sons Construction Company ("Yates"), alleging that Yates had breached the subcontract

between Otis and Yates for the installation of escalators at the Huntsville International Airport

(Docs. 1,7, & 8). Yates counterclaimed that instead Otis had breached the subcontract. (Doc. 11).

Judge Inge P. Johnson held a three day bench trial of the case in June of 2013. At the

conclusion of the trial, Judge Johnson entered judgment in favor of Otis on its breach of contract

claim and against Yates on its counterclaim. (*See* Doc. 72). Yates appealed, and the Eleventh

Circuit reversed Judge Johnson's decision and remanded with directions that judgment be

entered for Yates on Otis's breach of contract claim. *See Otis Elevator Co. v. W.G. Yates & Sons*

*Constr. Co.*, 589 F. App'x 953, 960 (11th Cir. 2014). The Eleventh Circuit also vacated the

1

judgment against Yates on its counterclaim and remanded Yates's counterclaim to this court for further consideration. *Id.* After the case was remanded, Senior Judge Johnson recused herself, and the case was reassigned to this judge.

On remand, Yates now moves for entry of summary judgment against Otis on its claim for payment under the Alabama Prompt Pay Act; entry of summary judgment for Yates on its counterclaim for breach of contract in the amount of $599,848.25, plus interest; and entry of an order declaring that Yates is entitled to an award of reasonable attorneys' fees and court costs. (Doc. 95).

For the reasons discussed in this Memorandum Opinion, the court will GRANT Yates's Motion as to its request for an entry of summary judgment against Otis on its claim for payment under the Alabama Prompt Pay Act; will GRANT Yates's Motion as to the liability aspect of its counterclaim for breach of contract; will GRANT IN PART and DENY IN PART Yates's Motion as to the damages for its counterclaim for breach of contract; and will GRANT Yates's Motion as to its request for an order declaring it is entitled to an award of attorneys' fees.

## II.    Legal Standard

### A.    Summary Judgment

Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden shifts to the non-moving party to produce sufficient favorable evidence "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "If the evidence [on which the nonmoving party relies] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (internal citations omitted).

In ruling on a motion for summary judgment, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). The evidence of the non-moving party "is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255.  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (internal quotation marks and citations omitted).  This standard exists because "the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson*, 477 U.S. at 255).

After both parties have addressed the motion for summary judgment, the court must grant

the motion only if no genuine issues of material fact exist and if the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

      B.    <u>Mandate Rule and Law of the Case Doctrine</u>

Because this case is on remand from the Eleventh Circuit, this court must rule on the Defendant's Motion for Summary Judgment in a manner that is consistent with the Eleventh Circuit's mandate. *See Litman v. Mass. Mut. Life Ins. Co.*, 825 F.2d 1506, 1511 (11th Cir. 1987) ("When an appellate court issues a specific mandate it is not subject to interpretation; the district court has an obligation to carry out the order."). This court is bound by both the Eleventh Circuit's findings of fact and conclusions of law. *See Wheeler v. City of Pleasant Grove*, 746 F.2d 1437, 1440 (11th Cir. 1984). The court may not "revisit[] matters decided expressly or by necessary implication in an earlier appeal of the same case." *AIG Baker Sterling Heights, LLC v. American Multi-Cinema, Inc.*, 579 F.3d 1268, 1270-71 (11th Cir. 2009) (citations omitted).

The court should also make its decisions in keeping with the law of the case. The law of the case doctrine holds generally "that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983), *decision supplemented by* 466 U.S. 144 (1984). The law of the case requires the court "to follow what has been decided explicitly, as well as by necessary implication, in an earlier proceeding." *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 n. 3 (11th Cir. 1990). Thus, in this case, rulings that were made by Judge Johnson, but that were not disturbed by the Eleventh Circuit, are the law of the case and should continue to guide this court's decisions.

### III.    Background

In 2010, Otis entered into a construction subcontract with Yates for the installation of four escalators – two interior and two exterior – in the baggage claim area of the Huntsville-Madison County Airport. Chapman Sisson was the architect on the project, and Yates was the general contractor.

Chapman Sisson drafted "Drawing A180" as part of the prime contract between Yates and the Airport. The subcontract between Yates and Otis incorporated "all terms and conditions of the Prime Contract," as well as, "all drawings, specifications, and details." (Subcontract, Doc. 94-1, at 4). It further provided that the escalator installation was to be completed "in strict accordance with this subcontract and with the prime contract." (*Id*.). Additionally, the subcontract stated that any inconsistencies in interpreting the contract documents were to "be referred to the appropriate design professional whose decision the Subcontractor shall implement at no additional cost." (*Id.*).

Drawing A180 set out design details and dimensions for the escalators. (*See* Pl.'s Trial Ex. 30). Chapman Sisson used tick marks in Drawing A180 to indicate that the escalator steps were to be 39.5 inches wide. The drawing did not specify whether these tick marks referred to the "rated width" or the "step width" of the escalator.

The step width is the width of the escalator stair treads where passengers stand. The rated width is the distance from handrail to handrail on the escalators and is approximately 8 inches wider than the step width. Escalators come in three standard step widths: 24 inches, 32 inches, and 40 inches. Manufacturers often vary a half inch from the standard measurement. For example, the step width of a "40-inch" escalator may actually be only 39.5 inches.

Trey Steber, the new equipment sales representative for Otis who prepared and submitted Otis's proposal, determined that it was "unclear" in Drawing A180 what the 39.5 dimension represented. (Trey Steber Deposition, Pl.'s Trial Ex. 74, 53:15-19). He nonetheless decided, without asking Yates or Chapman Sisson for clarification, that the project required escalators with a 32 inch step width. Escalators with a 32 inch step width would have a rated width of approximately 40 inches.

Otis thereafter submitted its bid and proposal containing specifications for the 32 inch escalators. Chapman Sisson approved Otis's proposal with a stamp, which qualified its approval with the statement: "This review is only for general conformance with the design concept of the project and general compliance with the information given in the Contract Documents." (Def.'s Trial Ex. 4). Yates also approved the proposed plans with a stamp that said its review was "for general compliance" and that the "[f]inal dimensions and quantities required for the project remain the responsibility of the subcontractor." (*Id.*).

Chris Waters from Chapman Sisson first noted a problem with the escalator step width when he visited the site on March 14, 2012. Waters visited the site bi-weekly, but did not notice the escalator discrepancy until March because plastic and barricades had been around the escalators on previous visits. After comparing Drawing A180 with Otis's shop drawings, Waters and Chapman Sisson, as the "appropriate design professional," determined that the 32 inch escalators supplied by Otis did not meet the specifications of Drawing A180.

When the Airport learned of the problem, it demanded that all four escalators be replaced with 40 inch escalators. It also threatened Yates with the prospect of liquidated damages of $5,000 a day beginning on April 20, 2012, and $7,500 a day beginning on June 17, 2012.

After a series of letters exchanged among the parties and a meeting in which all of the relevant parties – the Airport, Chapman Sisson, Yates, and Otis – presented their positions on the issue, Yates reached a compromise with the Airport that is reflected in Change Order 75. (*See* Doc. 94-7). In Change Order 75, the Airport agreed to keep all four of the 32 inch step width escalators. The Airport would keep the two exterior escalators in place with only minor modifications. The Airport would also keep the two interior escalators, but these interior escalators would be repositioned so that a third interior escalator with a 40 inch step width could also be installed. The Airport agreed not to seek liquidated damages from Yates in exchange for Yates performing the work at no cost. Yates was also required to credit the Airport $100,000 for accepting the exterior escalators and $36,000 for the costs of reconfiguring the interior escalators.

Yates and Otis agreed to complete the work under Change Order 75, but reserved their respective rights against each other under the subcontract. Otis completed the installation of the escalators as specified by Change Order 75.

Yates claimed that it incurred $599,848.25 in costs associated with Change Order 75. To offset these costs, Yates withheld payment on Otis's invoices for work performed pursuant to the original subcontract in the amount of $260,013.70. Yates withheld payment on an invoice on January 10, 2012 for the amount of $14,003.10; an invoice on February 2, 2012 for the amount of $113,610.60; an invoice on April 26, 2012 for the amount of $64,350.00; an invoice on September 14, 2012 for the amount of $7,650.00; and an invoice of October 2, 2012 for the amount of $60,490.00. (Def.'s Resp. to Pl.'s Int., Doc. 94-10, ¶ 3). Yates did not provide written notice to Otis of its intent to withhold payments until May 22, 2012. (*See* Letter from Heather Bennett, Doc. 94-11).

7

**IV.    Procedural History**

Otis filed suit against Yates in April of 2012, alleging that Yates had breached the subcontract, had committed fraud, and had violated the Alabama Prompt Pay Act, *Ala. Code* § 8-29-1, *et seq.* (*See* Complaints, Docs. 1, 7, 8, & 25). Otis sought to recover the $260,013.70 that Yates withheld from it; 12% interest on that sum; $123,659.97 in additional costs it incurred in performing Change Order 75; and attorneys' fees and costs. Yates denied its liability and counterclaimed that Otis had breached the subcontract, seeking damages for the additional costs it had incurred in executing Change Order 75. (*See* Doc. 11).

In October 2012 and February 2013, Yates and Otis each moved for partial summary judgment. Judge Johnson denied both of these motions, concluding that material issues of fact remained as to whether the parties had performed in accordance with the obligations of the subcontract. (Docs. 39, 40, 57, & 58).

In June of 2013, Judge Johnson held a three day bench trial. At the close of Otis' case, Judge Johnson granted Yates's Motion for Judgment as a Matter of Law on Otis's fraud claim.

After the trial, Judge Johnson issued an opinion granting judgment for Otis on its breach of contract claim and denying Yates's counterclaim. (Docs. 71 & 72). In finding that Otis had performed in accordance with the contract, Judge Johnson awarded Otis the $260,013.70 withheld from it by Yates[1], plus the additional $123,659.97 in costs Otis had incurred in carrying out Change Order 75. (Doc. 72). Pursuant to the Alabama Prompt Pay Act, Judge Johnson also awarded Otis its reasonable attorneys' fees and 12% per annum interest on the $260,013.70

---

[1] Post-judgment, Yates paid Otis the $260,013.70, and Otis, in return waived the requirement for a supersedeas bond upon appeal. (*See* Agreement Concerning Supersedeas Bond, Doc. 94-13).

improperly withheld from Otis by Yates. (*Id.*; Doc. 71, at 1).

Yates appealed, and the Eleventh Circuit found that the district court had erred in granting judgment in favor of Otis for two principal reasons. First, Otis had a duty to clarify the ambiguity it discovered in Drawing A180. Because Otis did not clarify this ambiguity, "it bore the risk that Yates would adopt a different, reasonable interpretation." *Otis Elevator Co.*, 589 F. App'x at 959. Second, Chapman Sisson's decision concerning the width of the escalators required by Drawing A180 was binding because the court determined that Chapman Sisson was "'the appropriate design professional' that the Subcontract vests with binding authority to resolve ambiguities." *Id.* at 960.

Accordingly, the Eleventh Circuit reversed the judgment entered in favor of Otis on its breach of contract claim and remanded the case to this court with instructions to enter judgment in favor of Yates on that claim. The Eleventh Circuit also vacated the judgment entered against Yates on its counterclaim and remanded the case for further consideration of Yates's counterclaim. *Id.* at 961.

Yates now moves for entry of summary judgment against Otis on its claim for payment under the Alabama Prompt Pay Act; entry of summary judgment for Yates on its breach of contract counterclaim in the amount of $599,848.25, plus interest; and entry of an order declaring that Yates is entitled to an award of reasonable attorneys' fees and court costs. (Doc. 95).

Consistent with the mandate of the Eleventh Circuit and the evidence that has been presented to this court on remand, the court will GRANT Yates's Motion as to its request for an entry of summary judgment against Otis on its claim for payment under the Alabama Prompt Pay Act; will GRANT Yates's Motion as to the liability aspect of its counterclaim for breach of

contract; will GRANT IN PART and DENY IN PART Yates's Motion as to the damages for its

counterclaim for breach of contract; and will GRANT Yates's Motion as to its request for an

order declaring it is entitled to an award of attorneys' fees.

**V.     Discussion**

In its mandate, the Eleventh Circuit reversed the judgment entered in favor of Otis on its

breach of contract claim, and remanded the case for further consideration of Yates's breach of

contract counterclaim. The parties disagree as to the meaning and effect of this mandate. (*See*

Status Report, Doc. 91). Otis argues that even though the Eleventh Circuit reversed the judgment

entered in its favor on the breach of contract claim, the opinion did not establish that Otis

breached the subcontract.

This court, however, finds that the mandate establishes that Otis was the breaching party.

This case turns on whether Otis was obligated to install escalators with a 40 inch step width

under the subcontract. The Eleventh Circuit answered this question in the affirmative, finding

that Otis should have sought clarification before unilaterally determining that 32 inch step width

escalators satisfied the subcontract requirements, and that Chapman Sisson's decision that 40

inch step width escalators were required was binding. Accordingly, because Otis did not supply

escalators with a 40 inch step width, it breached the subcontract, and Yates should be awarded

appropriate damages.

A.     Otis's Claim under the Alabama Prompt Pay Act

First, Yates moves for an entry of summary judgment on Otis's claim for payment under

the Alabama Prompt Pay Act ("APPA"). Otis argues that it may recover under the APPA even if

it was in breach of the subcontract because Yates failed to provide it with timely notice of its

intent to withhold payments.

Judge Johnson previously considered and rejected this reading of the APPA. (*See* Doc. 57). In February of 2013, Otis moved for partial summary judgment, arguing that it was entitled to $191,963.70, plus interest and attorneys' fees, because Yates had failed to provide timely notice as required by the APPA. (Doc. 43). Specifically, Yates withheld $191.963.70 in payments on Otis invoices from January 10, 2012 to April 26, 2012, but did not provide Otis with notice of its intent to withhold these payments until May 22, 2012. (*See* Letter from Heather Bennett, Doc. 94-11).

As Otis asserts, the APPA does contain a notice requirement. Alabama Code § 8-29-4(c) provides that for a contractor to withhold payment on an invoice, an owner must "notify a contractor in writing within 15 days of receipt of any disputed request for payment," and a contractor, subcontractor, or sub-subcontractor must "provide written notification within 5 days of disputed request for payment or notice of disputed request for payment."

In reviewing Otis's Motion for Partial Summary Judgment, Judge Johnson determined that Yates had failed to comply with the notice provisions of the APPA. (*See* Doc. 57, at 9 ("Yates failed to give the required written notice of its intention to withhold payment and has therefore violated the Act.")). Yates's violation notwithstanding, Judge Johnson still denied Otis's Motion because she concluded that performance in accordance with the contract is a prerequisite to payment under the APPA. (*See* Ala. Code § 8-29-2 ("*Performance* by a contractor, subcontractor, or sub-subcontractor *in accordance with the provisions of his or her contract* entitles them to payment from the party with whom they contract.") (emphasis added)). Judge Johnson explained: "The fundamental dispute between the parties is whether or not Otis'

11

performance was in accordance with the provision of the contract, [sic] therefore, material issues of fact exist as to whether Otis performed within the provisions of the contract entitling it to payment." (Doc. 57, at 8).

The law, as correctly applied by Judge Johnson in her ruling on Otis's Motion for Partial Summary Judgment, establishes that a party must perform in accordance with the terms of the contract to recover under the APPA. This ruling is the law of the case, and the court may not revisit it now.

When the Eleventh Circuit reversed the judgment on Otis's breach of contract claim against Yates, it also, by implication, reversed Judge Johnson's predicate finding that Otis had fulfilled its obligations under the subcontract. Without this predicate finding, Otis could not recover.

Yates's failure to provide timely notice, on its own, is not enough to entitle Otis to an award under the APPA. Otis must also have performed its obligations under the contract. *See* Ala. Code § 8-29-2; *see also Mobile Ala. Assoc., LLC v. Hoeppner Const. Corp.*, No. , 2011 WL 1539822, at *4 (S.D. Ala. 2011) (finding that defendant could recover attorneys' fees under the APPA because it had "substantially performed under the contract."). By failing to install escalators with a 40 inch step width, Otis breached the subcontract. Because Otis breached the subcontract, it is not entitled to payment under the Alabama Prompt Pay Act.

Accordingly, the court will GRANT Yates's Motion to enter summary judgment in its favor on Otis's APPA claim.

B.     Yates's Breach of Contract Counterclaim

Yates next moves for entry of summary judgment on its breach of contract counterclaim.

12

The Eleventh Circuit's opinion establishes that the subcontract between Otis and Yates required the installation of escalators with a 40 inch step width. Otis argues that despite the fact that it installed escalators with a 32 inch step width, it was not in breach of the subcontract, and Yates should not succeed on its counterclaim.

First, Otis argues that it did not breach the subcontract because it completed its obligations under Change Order 75. Otis contends that pursuant to the subcontract, a subcontractor fulfills its duties by replacing any nonconforming work. Otis suggests that had the Architect rejected the 32 inch escalators it had installed, "Otis could have been required to replace the escalators, and it presumably would have done so." (Doc. 97, at 15). Otis argues that it did not replace the nonconforming 32 inch escalators in their entirety because Yates did not ask Otis to do, and had instead directed Otis to complete the project according to Change Order 75. Therefore, Otis argues, because it fulfilled its obligations under Change Order 75, it was not in breach.

Second, Otis contends that even if it were in breach of the subcontract, Yates is not entitled to any damages because, pursuant to the subcontract, Yates was required to provide Otis written notice and an opportunity to self-perform before it could validly backcharge Otis. (*See* Subcontract Rider, Doc. 94-1, at 56, ¶ 7).

The court finds each of these arguments to be meritless. As an intial matter, when Otis installed escalators with the incorrect step width, it breached the subcontract. This breach was not fully cured by Otis's eventual agreement to and fulfillment of the compromise reflected in Change Order 75.

Next, Yates provided Otis with sufficient notice that it considered Otis to be in breach of

the subcontract. On four occasions – on March 20, 2012; March 22, 2012; March 30, 2012; and April 18, 2012 – Yates informed Otis of its position that the 32 inch step width escalators were nonconforming and directed Otis to remove at a minimum the two interior escalators and replace them with 40 inch step width escalators. (*See* Doc. 98-2). Yates's March 20, 2012 letter to Otis states that the Airport and Chapman Sisson "have determined that the escalator units provided and installed by [Otis] are non-conforming and not in compliance with the Contract Documents. [Otis] is responsible for all costs to correct the non-conforming conditions in accordance with the Subcontract Agreement." (*Id.*, at 2). Finding this proposal to be objectionable, Otis replied that "[t]here is no good reason to rip out the 32" escalators." (*Id.*, at 7). Otis further urged Yates to "work with [Otis] to resolve this matter short of a tear-out." (*Id.*, at 8).

This series of correspondence demonstrates that Otis was on notice that Yates, the Airport, and Chapman Sisson found the 32 inch escalators to be nonconforming, and that Yates intended to hold Otis responsible for costs incurred as a result of this breach. The letters also discredit Otis's assertion that, if Yates requested Otis to replace the 32 inch escalators, it would have done so. In these letters, Yates asked Otis to replace the interior escalators, but Otis declined to do so and sought to find a more agreeable solution. Yates's letters were, therefore, sufficient to place Otis on notice and to give Otis an opportunity to self-perform.

Moreover, in agreeing to carry out Change Order 75, Otis and Yates expressly agreed to reserve their respective rights against each other. (*See* Pl.'s Tr. Ex. 26, at 1 ("Yates and Otis will each bear its own respective expenses in completing the existing subcontract scope of work and the additional scope of work identified [sic] Change Order No. 75 attached hereto, and both Yates and Otis *reserve*, and *do not waive*, any and all rights and defenses they have per

14

subcontract or otherwise.") (emphasis added)). This express reservation of rights belies any

contention that Otis fulfilled its obligations and avoided future liability by performing its

obligations as modified by Change Order 75.

Consequently, the court finds that, because Otis did not supply escalators with a 40 inch

step width, it breached the subcontract. Therefore, the court will GRANT Yates's Motion for

Summary Judgment as to the liability aspect of its counterclaim. The court, however, finds that

genuine issues of material fact prevent the court from awarding Yates the full amount of damages

it claims. Therefore, the court will GRANT IN PART and DENY IN PART Yates's Motion as to

the damages for its counterclaim for breach of contract.

        1.      Direct Costs

First, Yates is entitled to recover the direct costs it incurred as a result of Otis's breach of

the subcontract. The subcontract provides that Otis is liable for all losses incurred by Yates as a

result of Otis's breach.  Section 5.1 of the subcontract states:

> The Subcontractor shall be liable to the Contractor for all
> expenditures, damages, losses, expenses, liabilities, and costs of
> whatever nature, including without limitation, attorneys' fees,
> incurred by the Contractor in supplementing the Subcontract, in
> completing the Subcontract Work, in remedying deficiencies in the
> Subcontract Work, or otherwise as a result of Subcontractor's
> performance delays, failures, inadequacies, or defaults.

(Subcontract, Doc. 94-1 § 5.1).

Section 5.1 of the subcontract further provides that "[t]he Contractor's records will be the

sole basis for computing the cost of this work, and the Contractor's administrative and overhead

expenses will be included in this cost." (Subcontract, Doc. 94-1 § 5.1).

Otis's breach created the need for Change Order 75. Thus, Yates is entitled to recover all

costs it incurred in carrying out Change Order 75 and remedying Otis's breach. Change Order 75 required Yates and Otis to remove and reinstall two existing escalators and to install one new escalator. Yates's financial records show that it incurred costs of $329,243.30 in carrying out this Order. (*See* Def.'s Trial Ex. 36, Doc. 94-12).

At trial, Yates's Operation Manager James Pinkston explained how Yates tracked its costs. Pinkston testified that Yates set up a separate cost code in its books to track the actual costs it incurred in carrying out Change Order 75. (Trial Tr. 6/13/13, Doc. 94-2, at 119, 122). Pinkston then used those cost numbers to prepare Yates's Trial Exhibit 36, which is an itemized list of the final costs Yates incurred as a result of the change order. (*Id.*, at 122; *see also* Def.'s Trial Ex. 36, Doc. 94-12). Pinkston testified that he thoroughly reviewed the reported costs to ensure that they were "properly coded." (Trial Tr. 6/13/13, Doc. 94-2, at 129). Pinkston explained that he "pulled out quite a bit" of charges that he did not think could be "fairly applied to [Otis]." (*Id.*). At trial, counsel for Otis did not challenge Yates's method of tracking costs or the accuracy of the numbers reflected in Yates's Trial Exhibit 36.

Accordingly, the court finds that no genuine issues of material fact exist regarding whether Yates incurred direct costs of $329,243.30 as a result of Otis's breach. Therefore, the court will enter partial judgment in Yates's favor for this amount.

2.    Penalty Required by Change Order 75

Next, the court will consider whether Yates is entitled to recover the change order penalty of $136,600. As part of the compromise reached with the Airport in Change Order 75, Yates's contract with the Airport was decreased by a total penalty of $136,600. (*See* Change Order 75, Doc. 94-7, at 5). Yates was required to credit the Airport $100,000 for accepting the 32 inch

exterior escalators and for refraining from assessing liquidated damages, and $36,600 for the added architectural and engineering design costs associated with reconfiguring the interior escalators.

Yates argues that it is entitled to recover this entire amount as damages because these losses are attributable to Otis's breach of the subcontract. Otis contends that these costs have not been linked to it.

Regarding the $100,000 credit, Otis contends that it cannot be held responsible for this cost because part of this credit was given by the Airport to relieve Yates of its obligation to pay liquidated damages for delay. Indeed, at trial, James Pinkston testified that from April 20, 2012 to May 1, 2012, Yates had already accrued liquidated damages of $5,000 a day, or $50,000 in total. (Trial Tr. 6/13/13, Doc. 94-2, at 126-27). Pinkston stated that the $100,000 credit reflected a $50,000 "credit for leaving the exterior escalators in place" and a "$50,000 [credit] in LDs," or liquidated damages to the Airport. (*Id.*, at 127).

Yates contends that to the extent the $50,000 credit was given to "buy Yates out of liquidated damages," the loss is still attributable to Otis because Otis's defective work created a critical-path delay. Yates suggests that were it not for Otis's defective work, the project would not have been delayed, and liquidated damages would not have accrued.

However, as will be discussed in greater detail in the following section of this Opinion, the court finds that genuine issues of material fact remain as to whether the delays were wholly caused by Otis. If all of the delays were not caused by Otis's breach, and if Yates would have incurred liquidated damages even without Otis's breach, then the full portion of the credit given for liquidated damages cannot be attributed to Otis. Because of these fact issues, the court will

deny Yates's Motion for Summary Judgment as to the $50,000 credit that was given to relieve Yates from its obligation to pay liquidated damages.

The court, however, finds that the remaining $50,000 loss was incurred as a result of Otis's installation of non-conforming escalators. The evidence establishes that, at a minimum, this $50,000 was given to the Airport as a credit for keeping the non-conforming exterior escalators in place. Otis has offered no evidence that would create a genuine dispute of material fact as to the reason for this $50,000 credit. Accordingly, the court will grant Yates's Motion for Summary Judgment as to the $50,000 credit provided as a concession to the Airport for accepting the exterior escalators.

Otis also challenges the $36,600 credit provided for the Architect's additional design expenses associated with Change Order 75. Otis contends that this amount was a "not-to-exceed, subject to final adjustment" amount, and that Yates has not proven how much of that credit was ultimately given to the Architect.

Change Order 75 does state that the "$36,600 is a not-to exceed amount and will be adjusted based on actual time and material." (Change Order 75, Doc. 94-7, at 5). However, the evidence as a whole establishes that the entire $36,600 was deducted from Yates's contract balance. The face page to Change Order 75 states that "[t]he Contract Sum will be decreased by this Change Order in the amount of $136,600" and then reflects a new contract sum, which accounts for the $136,600 deduction. (*Id.*, at 2). James Pinkston, Yates's Operation Manager, and Jeffrey Cross, Yates's Vice-President and Atlanta Division Manager, both testified at trial that the entire amount of the $36,600 not-to-exceed credit was taken out of Yates's contract. (Trial Tr. 6/13/13, Doc. 94-2, at 124-25; Trial Tr. 6/12/13, Doc. 94-8, at 163-64).

18

Therefore, the court finds that the entire $36,600 was deducted from the contract balance and that no genuine material issues of fact exist regarding whether Yates incurred this loss of $36,600 or whether this loss was attributable to Otis.

Accordingly, the court will award Yates this $36,600, along with the $50,000 credit that Yates has proven was attributable to Otis's breach, for a total of $86,600 in damages for penalties incurred along with Change Order 75.

### 3.    Critical-Path Delay Costs

Next, Yates claims that it is entitled to recover $134,004.95 in costs it incurred as a result of delays. This amount represents the overhead costs Yates incurred in keeping the project mobilized from June 18 to September 15, 2012, as required by Change Order 75. Yates acknowledges that it initially viewed the delay costs as involving disputed facts (*see* doc. 91, at 22), but now contends that upon more careful examination of the evidence, it does not perceive any dispute of material fact on this question, and that the delay costs are attributable to Otis's breach. Otis, on the other hand, contends that Otis is not responsible for the delay costs because the project would have been delayed even without Otis's breach.

At trial, on direct examination, James Pinkston testified that before the problems with the escalators were discovered, Otis was on schedule to finish the project around June 20, 2012. (Trial Tr. 6/13/13, Doc. 94-2, at 205-06). Pinkston's testimony, however, is contradicted by a February 22, 2012 Yates schedule update, which indicates that at that time, the project was estimated to be completed by August 13, 2012. (*See* Pl.'s Ex. 49, Doc. 94-4). This schedule demonstrates that as of February 22, 2012—nearly a month before anyone noticed a problem with the escalators—Yates already anticipated that it would finish the project almost two months

after the date on which it should have been completed. When questioned about this schedule on cross-examination, Pinkston admitted that the schedule reflected an estimated completion date of August 2012, but said that he did not create this version of the schedule and did not know why it was created. (Trial Tr. 6/13/13, Doc. 94-2, at 207-10).

Additionally, James Pinkston and Christopher Waters, a Senior Architect with Chapman Sisson and the Project Manager for the baggage claim expansion project, each testified that, although Yates only seeks to hold Otis liable for the delay from June 18 to September 15, the project as a whole was not substantially completed by Yates until December 2012. (Trial Tr. 6/13/13, Doc. 94-2, at 213-14; Trial Tr. 6/12/13, Doc. 94-6, at 293).

Otis's counsel also questioned James Pinkston regarding other delays to the project during the June 18 to September 15 time period. Pinkston admitted that several other aspects of the project unrelated to Otis's escalator work were delayed during that time. Some of the other delays included electrical work, the installation of HVAC duct work, the installation of roof panels, the installation of garage beams and work on the parking decks, and the installation of stucco and stone. (Trial Tr. 6/13/13, Doc. 94-2, at 218-239; *see also* Doc. 97, at 11-12). Pinkston also testified that the Airport issued numerous "CCDs," or construction change directives during this time period. (Trial Tr. 6/13/13, Doc. 94-2, at 218-239).

Otis contends that these delays constitute "concurrent delays," and that if other causes contributed to the delay, then neither party can recover delay damages.

"'Concurrent' delay is delay to the critical path caused concurrently by multiple events not exclusively within the 'control' of one party." Bruner & O'Connor on Construction Law § 15.67 (2002). When concurrent delays exist, "neither party may benefit monetarily from the

delay." *Id.* A contractor seeking to hold a subcontractor liable for a delay "must prove that delay to the critical path would not have occurred 'but for' an event within the 'control of' the other party." *Id.*

Yates argues that Otis is responsible even if other delays occurred because only Otis's defective work caused a "critical path" delay.

The "critical path method" of scheduling identifies "'the longest path through the network [of identified and logically sequenced construction activities] that establishes the minimum overall project duration.'" Bruner & O'Connor § 15.5. The critical path method uses computer software to plan the sequencing and duration of a project by identifying those activities that are critical to timely completion. *Id.* If an activity on the critical path is delayed, the entire project is delayed.

The court in *U.S. Fidelity* explained:

> The critical path is the longest series of the work activities through the performance of a whole project. If an activity on the critical path exceeds its scheduled duration, the termination of the project will be delayed unless some other activity on the critical path is performed in less than its scheduled time. A work activity not on the critical path may be completed later than its scheduled time without affecting the termination of the project unless the non-critical activity exceeds its "float"[2] and thereby becomes an activity on the critical path.

*U.S. Fidelity & Guar. Co. v. Orlando Utilities Comm'n*, 564 F. Supp. 962, 968 (M.D. Fla. 1983).

Although Otis points to numerous delays that were the result of subcontractors other than it, Otis has not established that any of these other delays were delays to the critical path. As the

---

[2] "'Float' is 'the amount of time by which an activity can be delayed without affecting the project's completion date.' An activity that has 'float' is not on the project's 'critical path.'" Bruner & O'Connor § 15.9.

court in *U.S. Fidelity* explained, if only non-critical activities are delayed, then the total time of the project will not be extended. 564 F. Supp. at 968; *see also G.M. Shupe, Inc. v. United States,* 5 Cl. Ct. 662, 728 (Cl. Ct. 1984) ("[O]nly construction work on the critical path had an impact upon the time in which the project was completed.").  If in fact *only Otis's work* affected the critical path scheduling, then the delay costs could be attributed to Otis.

However, in viewing all of the evidence and all of the inferences drawn from the underlying facts in the light most favorable to Otis, the court finds that genuine issues of material fact remain as to whether only Otis's work caused a critical path delay. At trial, James Pinkston was unable to account for the February 2012 Yates schedule update (doc. 94-4), which already indicated a delay of two months, or to explain how if the delay was solely caused by Otis, the project could have been delayed before the problems with Otis's work were ever discovered. Yates has also failed to explain how, if only Otis caused a delay to the critical path, the project was delayed for three months beyond the time period attributed to Otis.

Accordingly, the court finds that Pinkston's inconsistent testimony and the evidence of delays not caused by Otis create genuine issues of material fact regarding whether the delay costs can be attributed to Otis. Therefore, the court will deny Yates's Motion as to its request for an award of delay costs.

C.    Prejudgment Interest

Yates also contends that it is entitled to 8% per annum interest on its damages award. Alabama law establishes that prejudgment interest is available in breach of contract cases. *See* Ala. Code § 8-8-8 ("*All contracts*, express or implied, for the payment of money, or other thing, or for the performance of any act or duty *bear interest* from the day such money, or thing,

estimating at its money value, should have been paid, or such act, estimating the compensation therefor in money, performed.") (emphasis added). The Alabama Code provides for 8% per annum interest on damages for breach of a written contract. *See* Ala. Code § 8-8-1 ("[T]he rate of interest by written contract is not to exceed $8 upon $100 for one year and at that rate for a greater or less sum or for a longer or shorter time.").

Prejudgment interest is available in breach of contract cases *if* the damages were "reasonably certain" at the time of the breach. *Goolesby v. Koch Farms, LLC,* 955 So. 2d 422, 429 (Ala. 2006); *see also Miller & Co. v. McCown*, 531 So. 2d 888, 889 (Ala. 1988) (explaining that prejudgment interest may be awarded if "an amount is certain or can be made certain as to damages at the time of breach."). Prejudgment interest is also available in instances "where the damages are complete at a given time so as to be capable of determination at such time in accordance with known standards of value." *Lapeyrouse Grain Corp. v. Tallant*, 439 So. 2d 105, 111 (Ala. 1983). Prejudgment interest is not available in cases where the measure of damages is unascertainable or where damages are discretionary or punitive. *See, e.g.*, *State Farm Mut. Auto Ins. Co. v. Fox*, 541 So. 2d 1070 (Ala. 1989) (finding that prejudgment interest was not available on punitive damages in wrongful death case).

Furthermore, damages may be "reasonably certain" when they can be ascertained by the damages provisions in the parties' contract. *See Miller*, 531 So. 2d at 889 (finding that the damages amount was reasonably certain because of "the damages provisions stipulated to in the contract"). A disputed fact does not preclude an award of prejudgment interest. *See id.* at 890 (explaining that, although the parties disputed the amount of timber that had been wrongfully harvested by the Defendant, prejudgment interest could be awarded because "the loss to the

23

landowners could be fixed by a simple mathematical computation by reference to the liquidated damages provisions of the contract.").

Following the reasoning of *Miller*, Yates contends that its damages were "reasonably certain" because they were ascertainable by reference to the subcontract's damages provisions. Section 5.1 of the subcontract provided the measure of damages owed to Yates in the event of Otis's breach or default. As of September 15, 2012, the date on which the work required by Change Order 75 was substantially completed, these costs were fixed and ascertainable by reference to Yates's books. Therefore, Yates argues that it is entitled to recover prejudgment interest on its damages, at a rate of 8% per annum. Otis does not challenge whether Yates's damages were reasonably certain or whether prejudgment interest may be awarded in this case.

Accordingly, the court finds that no genuine issues of material fact exist as to whether Yates may recover prejudgment interest on the damages that the court has determined it may award to Yates in this Opinion. Specifically, Yates may recover prejudgment interest on the $329,243.30 it incurred in direct costs and the $86,600 it incurred in penalties associated with Change Order 75. The court finds that these damages were reasonably certain and were ascertainable by reference to the subcontract. Therefore, the court will award Yates prejudgment interest, on the sum of $415,843.30, accruing from September 15, 2012 at the rate of 8% per annum.[3]

---

[3] Yates may not recover prejudgment interest on either the $134,004.95 it claims in delay costs or the additional $50,000 it claims in penalties associated with Change Order 75, even if the court were to later award Yates some or all of these claimed damages. The court finds that these damages were not reasonably certain.

D.      Attorneys' Fees and Court Costs

Finally, Yates moves for entry of an order declaring that it is entitled to an award of

reasonable attorneys' fees and court costs. Yates argues that it is entitled to an award of

attorneys' fees and costs under both the subcontract agreement and the Alabama Prompt Pay Act.

First, Yates is entitled to an award of attorneys' fees and costs pursuant to the Alabama

Prompt Act. The Alabama Code provides that in any civil action brought under the APPA "the

party *in whose favor a judgement is rendered* shall be entitled to recover payment of reasonable

attorneys' fees, court costs and reasonable expenses from the other party." Ala. Code § 8-29-6.

The Alabama Supreme Court has interpreted this statute to mean that "*either party*, so long as it

was 'the party in favor a judgement [was] rendered,' would be entitled to recover attorneys' fees,

court costs, and reasonable expenses 'from the other party.'" *Tolar Const., LLC v. Kean Elec.*

*Co.,* 944 So. 2d 138, 148 (Ala. 2006) (quoting Ala. Code § 8-29-6) (emphasis added). The court

in *Tolar* explained that the attorneys' fees provision in the APPA "cut[s] both ways" and that

"[m]andating or allowing an award of attorneys' fees to the prevailing party should discourage

frivolous excuses from owners and contractors for failing to pay promptly and should discourage

contractors and subcontractors from demanding payments that are not due." *Tolar*, 944 So. 2d at

150 (quoting John W. Hays, *Prompt Payment Acts: Recent Developments and Trends*, 22 Constr.

Law 29 (2002)).

As discussed previously in this Opinion, the court is granting summary judgment in

Yates's favor on Otis's APPA claim. Therefore, Yates, as the party in whose favor a judgment

will be rendered, is entitled to attorneys' fees under the APPA.

The Alabama Prompt Pay Act notwithstanding, Otis argues that Yates may not recover its

attorneys' fees because recovery of such fees is precluded by the subcontract. Otis relies on Section 14.4 of the subcontract, which states that "if the Contractor and Subcontractor litigate or arbitrate a monetary claim each party shall be solely responsible for its respective costs, expenses and attorneys' fees, unless specifically allowed to be recovered pursuant to another provision of this Subcontract." (Subcontract, Doc. 94-1, § 14.4) (emphasis added).

Yates, on the other hand, contends that it may recover attorneys' fees pursuant to Section 5.1 of the subcontract. That section provides that in the event of "Breach, Default, Supplementation, [or] Termination," the subcontractor is liable for all costs, "*including without limitation, attorneys' fees*, incurred by the Contractor in supplementing the Subcontractor, in completing the Subcontract Work, in remedying deficiencies in the Subcontract Work, or otherwise as a result of Subcontractor's performance delays, failures, inadequacies, or defaults." (Subcontract, Doc. 94-1, § 5.1) (emphasis added).

A provision in the subcontract rider separately provides that "[i]t is understood and agreed that only the prevailing party in any litigation shall be entitled to recovery of its reasonable attorney fees." (Subcontract Rider, Doc. 94-1, ¶ 11). Yates suggests that this provision amends Article 14 and overrides Section 14.4 to provide for recovery of attorneys' fees by the prevailing party in litigation over a monetary claim.

The court finds that these provisions are conflicting, and the contract is ambiguous. The court cannot determine, based on the text of the subcontract alone, whether Yates may recover the attorneys' fees it has incurred in this litigation. Therefore, the court must turn to the rules of contract interpretation.

Alabama law provides that when a contract is ambiguous on its face, the court should

26

"look to the intention of the parties." *Charles H. McCauley Assoc., Inc. v. Snook*, 339 So.2d

1011, 1015 (Ala. 1976) (citing *City of Fairhope v. Town of Daphne*, 208 So. 2d 917 (Ala. 1968)).

In determining the intention of the parties, the court may look to the "conduct and relations of the

parties." *McCauley*, 339 So. 2d at 1015 (citing *Merchants' Nat. Bank of Mobile v. Hubbard*, 125

So. 335 (Ala. 1929)). Furthermore, "[w]here a contract is subject to two constructions,

unconscionable results are to be avoided." *McCauley*, 339 So. 2d at 1015 (citing *Lowery v. May*,

104 So. 5 (Ala. 1925)).

The court finds the pleadings and representations made to the court by Otis throughout

this litigation to be particularly relevant conduct. Although Otis now argues that Yates should not

be able to recover its attorneys' fees, when the tables were turned, Otis repeatedly represented to

the court that it should be awarded attorneys' fees. (*See* Complaint, Doc. 1; First Amended

Complaint, Doc. 7; Second Amended Complaint, Doc. 8; Third Amended Complaint, Doc. 25;

Otis's Motion for Partial Summary Judgment, Doc. 43). When the court entered judgment in

Otis's favor, it awarded Otis its reasonable attorneys' fees. (Doc. 72). If the provision in the

subcontract prohibiting recovery of attorneys' fees in "litigation over monetary claims" did not

preclude Otis from recovering its attorneys' fees, it likewise cannot preclude Yates from

recovering its attorneys' fees. To hold any differently would be an unconscionable result.

Therefore, the court finds that the intention of the parties in drafting the subcontract was to allow

recovery of attorneys' fees by the prevailing party in this litigation.

Moreover, Otis is judicially estopped from arguing that the subcontract does not allow for

the recovery of attorneys' fees. *See American Nat. Bank of Jacksonville v. Fed. Deposit Ins.

Corp.*, 710 F.2d 1528, 1536 (11th Cir. 1983) (explaining that the doctrine of judicial estoppel "is

27

designed to prevent parties from making a mockery of justice by inconsistent pleadings."). Otis has consistently plead and argued before the court that it was entitled to attorneys' fees in this litigation. In seeking attorneys' fees on its own behalf, Otis has represented to the court that an award of attorneys' fees is proper under the subcontract. Therefore, Otis may not now argue the opposite.

Accordingly, the court finds that Yates is entitled to an award of its reasonable attorneys' fees and costs. Yates is the party in whose a favor a judgment will be rendered, and the conduct of the parties evidences their intent to allow for the recovery of attorneys' fees in this case.

**VI.    Conclusion**

For the reasons discussed in this Memorandum Opinion, the court will GRANT Yates's Motion for Summary Judgment IN PART and will DENY it IN PART.

The court will GRANT Yates's Motion as to its request for an entry of summary judgment against Otis on its claim for payment under the APPA.

The court will also GRANT Yates's Motion as to the liability aspect of its counterclaim for breach of contract. However, the court finds that genuine issues of material fact prevent the court from awarding Yates the full amount of damages it claims. Therefore, the court will GRANT IN PART and DENY IN PART Yates's Motion as to the damages for its counterclaim for breach of contract. Specifically, the court will award Yates the $329,243.30 it incurred in direct costs and the $86,600 it incurred in penalties, for a total of $415,843.30. The court will also award Yates prejudgment interest on this sum, at a rate of 8% per annum, accruing from

September 15, 2012 to the date it enters partial judgment for Yates in this amount.[4]

The court will not award Yates the $134,004.95 it claims in delay costs or the $50,000 credit given to the Airport for liquidated damages because the court finds that genuine issues of material fact exist as to whether these costs are attributable to Otis's breach. The court will set the case for a bench trial to determine whether Yates is entitled to the $134.004.95 it claims in delay costs or the additional $50,000 it claims in penalties. After the bench trial, the court will enter a final judgment addressing the remaining damages.

Finally, the court will GRANT Yates's Motion as to its request for an order declaring that it is entitled to an award of attorneys' fees and court costs.

DONE and ORDERED this 3rd day of March, 2016.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE

---

[4] The court will enter partial, rather than full, judgment in Yates's favor because the court is not awarding Yates the full amount of damages it requests at this time.

The court's partial judgment will be complete as to the $415,843.30 that the court finds it may now award Yates. Interest on this sum will stop accruing on the date of the court's partial judgment.